## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CHRISTOPHER GANN, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>NISSAN NORTH AMERICA, INC., a California corporation,<br><br>      Defendant. | CASE NO:<br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Christopher Gann ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against defendant Nissan North America, Inc. ("Defendant" or "Nissan").

## NATURE OF THE ACTION

1.    Model Year 2013–2014 Nissan Altima vehicles ("Subject Vehicles") contain defective continuously variable automatic transmissions ("CVTs") that cause shuddering, hesitation, stalling, unusual noises, and ultimately, premature transmission failure. The CVTs pose a significant safety risk. When the shuddering occurs, momentum of the Subject Vehicle is suddenly lost, the rate of speed drops or the vehicle stalls, and the brake lights do not illuminate. The defect is especially dangerous because it manifests when the driver presses the accelerator. Just when the driver attempts to accelerate, nothing occurs. This is sometimes followed by an unexpected surge of power. The CVTs increase the risk that the driver will lose control and cause a collision.

2.     When owners of Subject Vehicles seek repair of their defective transmissions, they are routinely informed that the transmission requires replacement, at a cost upwards of $3,000. With the replacement, the vehicles are then equipped with another defective CVT, and the cycle repeats.

3.     Nissan knew the CVTs were defective in this way, were prone to shuddering, hesitation, stalling, unusual noises, and eventual premature failure yet omitted these material facts from Plaintiff and other Class members. Nissan misrepresented the safety risk the Subject Vehicles pose to occupants and the public. Nissan knowingly engaged in omissions of material facts and false and misleading representations regarding the performance of CVTs in the Subject Vehicles.

4.     The defective CVT included in the Altima purchased and leased by Plaintiff and other Class members did not perform as advertised, as promised, and as warranted. As a result of Nissan's unfair, deceptive, and fraudulent conduct, Plaintiff and the other Class members received a car worth less than as represented and less than what they paid for when purchasing their Subject Vehicles. Plaintiff and the other Class members have suffered injury in fact and incurred damages.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

6.     Venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Middle District of Tennessee.

2

## PARTIES

7.      Plaintiff Christopher Gann is a citizen of the State of California. On July 10, 2013, Plaintiff purchased a new 2013 Nissan Altima with a 2.5-liter four-cylinder engine with the Xtronic CVT from Central Valley Nissan located at 4530 N. McHenry Ave., Modesto, CA 95356. Plaintiff also purchased a 100k mile extended warranty. Plaintiff's Subject Vehicle frequently exhibited the CVT defect, including juddering while driving and an acceleration delay with slow response time while getting up to speed. On or about December 3, 2016, Plaintiff's Subject Vehicle began to judder while driving and eventually stalled completely. Plaintiff was unable to start the Subject Vehicle again and had to have it towed to Central Valley Nissan. Mr. Gann complained of the juddering and stalling to the Nissan-authorized dealer, and he was informed the CVT needed to be replaced. The Nissan dealership charged him $3,754.49 to replace the transmission. Despite the new transmission, the Subject Vehicle continued to experience the juddering and delayed acceleration. Plaintiff purchased the Subject Vehicle believing it was safe, and he would not have purchased it if he knew it was unsafe. At various times before experiencing the complete stalling event, Plaintiff brought his Subject Vehicle to Central Valley Nissan for maintenance and repairs performed by Nissan technicians. As a result of Nissan's conduct and his purchase of the defective Altima, Plaintiff has lost money and been damaged.

8.      Defendant is a California corporation with its principal place of business in Franklin, Tennessee. Defendant is the North American subsidiary of Nissan Motor Co. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers and distributors, the Subject Vehicles in the United States to Plaintiff and the other Class members.

3

## <u>FACTUAL BACKGROUND</u>

***The Defective 2013–2014 Nissan Altima CVT***

9.      The Subject Vehicles are equipped with CVTs designed and manufactured by Jatco, Ltd., a majority-owned subsidiary of Nissan that specializes in the design and manufacture of transmissions. Unlike conventional automatic transmissions with planetary gears, CVTs employ two pulleys of adjustable diameter that continuously adjust the gear ratio of the transmission in response to the operator's inputs.

10.      The CVTs Nissan used in the Subject Vehicles are defective. These transmissions fail to deliver the smooth operation Nissan promised. Instead, they frequently exhibit a shuddering sensation that is undesirable and detracts from the Subject Vehicles' performance. They eventually fail to operate altogether. Owners of the Subject Vehicles often experience the same defective judder, hesitation, stalling, or shudder, in addition to unusual noises, and premature transmission failure.

11.      Carcomplaints.com, a website that compiles consumer complaints, has advised that consumers should "avoid [the 2013 Nissan Altima] like the plague," due to the high number of complaints regarding vibration and transmission failure related to the CVT. It was the biggest complaint on the website for a time.[1]



---

[1] https://www.carcomplaints.com/Nissan/Altima/2013/transmission/transmission_stopped_working.shtml

4

12.     Similarly, carcomplaints.com has branded the 2014 model with its badge "Beware of the Clunker" primarily because "[o]wners are complaining about vibration and even transmission failure related to the CVT."[2]

13.     As of August 7, 2018, the National Highway Traffic Safety Administration ("NHTSA") has received 263 complaints regarding the CVT power train on the 2013 Nissan Altima and 99 complaints regarding the CVT power train on the 2014 Nissan Altima. Almost all of these complaints regard the CVT's problems with jerking, stalling, shuddering, hesitating, or failing prematurely. A sampling of these complaints includes:

- Transmission has failed abruptly in Nissan Altima 2013 at 79k miles almost ending in a collision in mid intersection. Nissan says it's past warranty and will not replace. I'm on the hook for $3800 for a faulty transmission that could've caused a deadly accident. My kids were in the car at the time. . . ." (NHTSA ID number 11040232)

- My 2013 Nissan Altima, which was purchased new has had issues with the CVT transmission since it was purchased. in 9/2014 at 42k miles the transmission failed and was replaced. Now in 9/2017 I am being told by Nissan that the transmission that was replaced by them in 2014 is also bad and needs to be replaced at a cost to me of $4,100.00. Who can afford a $4,100 repair on a vehicle that is still being paid for monthly, and why is it the consumer's fault that Nissan NA is making and selling faulty, unsafe products? Nissan NA knows of the ongoing issues with these CVT transmissions, but chooses to [do] nothing to rectify the issues. My vehicle will not pull and makes a whining noise while I am driving. This i[s] the same issue that occurred in 2014. While I was in motion on a major interstate the vehicle began to lose power, spudder [sic] and jerk, and dropped down to about 10-15 mph. It was a horrifying experience to be in the middle of the interstate traveling at 60 mph, and all of a sudden start to lose speed. I was finally able to get the vehicle to the shoulder safely. These vehicles are unsafe to be driven.

- My 2013 Nissan Altima is stalling when being shifted into reverse or drive. The first instance that this happened, I was driving and slowing down at an intersection. The rpm's dropped, the car shook a little and it died. I had to put it into park and restart. I was able to make it about 2 miles away when it did it again, this time on a residential street thankfully. I tried about 5 times and was not able to move the vehicle, every time I shifted it into drive, it stalled. . . ." (NHTSA ID number 11048230)

---

[2] https://www.carcomplaints.com/Nissan/Altima/2014/

- I was stopped at a red light and the car just turned itself off. I turn it back on and as soon as I put it in drive it turns itself off again. I finally get it going and get to my destination without anymore [sic] problems. The next day I go to start it and as soon as I put it in drive the car turns itself off, I continue to try to get it going but never did. I get it towed to the Nissan dealership and they said the entire transmission needs to be replaced. I get the transmission replaced. Now 3 months after I get a brand new transmission it's doing the same thing again. I start the car go to put it in drive and it turns off. (NHTSA ID number 11046444)

- Transmission failed at 44k mileage. First the engine shut off while driving without any warning or signs on highway. Then after reprogramming of the transmission by the dealer, car runs abnormally. Engine RPM unstable, unpredictable, causing speed changes. No pedal response or slow acceleration. Difficult to accelerate, especially over 40 MPH. Gearing shifting between D and N very often leave the car in gear in N for a few seconds. (NHTSA ID number 11110036; Incident Date: May 15, 2018).

- In July / August of 2017, my vehicle was sputtering at lower speeds when accelerating or decelerating and then the vehicle would suddenly turn off. There were several scenarios when this happened during busy traffic. Upon receiving a manufacturer recall, I took the vehicle to the dealership for maintenance on the transmission computer system. All seemed fixed until June of 2018 when the vehicle was having the same issues, again while in the middle of traffic. I took the vehicle into the dealership and the dealership is telling me the transmission torque converter was damaged and I need to replace the entire transmission at a cost of $4,300. Upon internet research, it seems this has been a common problem for Nissan's CVT transmission; in fact, Nissan extended 2012 and previous models transmission warranties to 10 year 120,000 miles. So far, Nissan has offered no assistance or good will in fixing the defected part / issue. (NHTSA ID Number 11103826; Incident Date: June 22, 2018).

- While driving home from work the car shuttered and cut off after having stopped for a light. This happened when I press the [accelerator] to continue on. I put the car in park applied my foot to the break and restarted the car. Every time I would drive to put the car in gear it would cut off. It kept doing this over and over. Local police came and with the help of a Good Samaritan pushed my car off the road to a safe place. I had to have my car towed to the dealer where they were unable to duplicate the problem and said that the diagnostic computer test did not show any codes for the problem. They ended up updating the transmission module and said they hoped this would fix the problem. The problem continues to occur and I have had to avoid stopping at lights due to the car wanting to cut off. This seems to be a problem that other Nissan car owners are also facing. This is a very dangerous situation to be in due to the fact that you never know when you will be stranded in the middle of a street whether it be interstate stop and go traffic or normal city street traffic. Once the car stalls it's no way to start it and put it in gear to drive without it stalling again and again. Nissan owners need a recall. (NHTSA ID Number 11102336; Incident Date: June 5, 2018).

6

- My transmission stopped working in the middle of a busy intersection with my grandchildren in the car. Construction vehicles were speeding by on either side and I was helpless. I was told by my dealer that the warranty was up by three months even though my 2013 Nissan Altima only had 50,000 miles on it. The safety factor should speak for itself. On the web there are hundreds upon hundreds of complaints about this issue especially the 2013 Nissan Altima. I believe it's time to recall this automobile before someone gets seriously hurt. (NHTSA ID Number 11090225; Incident Date: April 20, 2018).

***Nissan's Deceptive Marketing of the CVT in Subject Vehicles***

14.     Contrary to the danger and poor performance of the Subject Vehicles, which are being experienced by thousands of consumers, Nissan promoted the Subject Vehicles' CVT as a major selling point. In particular, Nissan focused on the CVT's supposed "smoothness."

15.     In its press kit for the 2013 Altima, Nissan boasted that the vehicle included "a next-generation Xtronic CVT that takes Nissan's two decades of Continuously Variable Transmission leadership into a new dimension of smooth operation and fuel efficiency." Nissan also described the transmission as "designed for fluid-feeling performance."[3] Similarly, in its press kit for the 2014 Altima, Nissan advertised improved "drivability and responsiveness" owing to the CVT and describes the CVT as "smooth."[4]

16.     In a magazine ad for the 2013 Altima, Nissan prominently featured the "all-new CVT," relying on the CVT as one of the major selling points of the vehicle:

---

[3] http://nissannews.com/en-US/nissan/usa/presskits/2013-nissan-altima

[4] http://nissannews.com/en-US/nissan/usa/channels/Altima-Sedan/presskits/us-2014-nissan-altima-sedan-press-kit

7



**SHIFT_**

**NISSAN**
**ALTIMA®**

- Lightweight Materials
- All-New CVT
- Targeted 38 MPG HWY*

## GO FARTHER, GO FASTER, GO LIGHTER.

Less is more when it comes to the All-New Nissan Altima: Our 2013 models feature weight-reducing materials like aluminum hoods and high-strength steel to increase MPG, and an improved CVT to achieve lower rpm at higher speeds. The innovation doesn't stop there; 70% of our sedans and crossovers now receive 31 MPG HWY or better. The most innovative Altima ever rings in Nissan's most innovative year.

**Nissan. Innovation that excites.**



The All-New Nissan Altima® coming Summer 2012

*2013 projected EPA estimate of 38 MPG highway for Altima 2.5S. Actual mileage may vary with driving conditions – use for comparison only. Always wear your seat belt, and please don't drink and drive. ©2012 Nissan North America, Inc.

17. Nissan even produced and published several videos dedicated toward communicating the supposed smoothness and "seamlessness" of the CVT used in the Subject Vehicles.[5]

18. While promoting and marketing the Subject Vehicles, and in particular the Subject Vehicles' CVT (including the CVT's "smoothness," "fluid-feeling performance," "fuel efficiency," "drivability and responsiveness," and "performance"), Nissan concealed and failed to disclose the substantial defect in the CVTs, which was known to Nissan.

***Nissan's History of Transmission Defects***

19. At the same time Nissan was touting the CVT to the car-buying public, Nissan was well aware of the problems it had long had with its CVTs, and a litany of failed countermeasures in a purported effort to resolve the problems associated with its CVTs.

20. In 2009, in the wake of mounting complaints about the defective CVT, Nissan doubled the warranty on the CVT to ten years or 120,000 miles for a large number of Nissan vehicles, including: 2003-2007 Nissan Muranos, 2007-2010 Nissan Sentra, Versa 1.8SL, Maxima, Altima, Altima Coupe, and Altima Hybrid vehicles, 2008-2010 Nissan Rogue vehicles, 2009 and 2010 Nissan Cube vehicles, and 2009 and 2010 Nissan Muranos.[6] Nissan also offered to reimburse current or former owners or lessees for past CVT repair or replacement that would have been covered under the new, extended warranty. However, Nissan has not extended the warranty or made similar offers for reimbursement as it relates to the Subject Vehicles.

21. Nissan also issued numerous technical service bulletins ("TSBs") to purportedly address CVT issues, described for example in NTB10-121 as a "slight vehicle hesitation type feel

_____

[5] https://www.youtube.com/watch?v=L6tZ6NNnY9M, http://nissannews.com/en-US/nissan/usa/channels/Altima-Sedan/videos/altima-video
[6] http://www.nissanassist.com/ProgramDetails.php?menu=2

9

and/or a surge type feel when all of the following conditions are present: Speed between 10 and 45 mph, and transmission torque converter clutch is engaged (lock mode), and Engine RPM between 1200 and 2000, and Light acceleration." This TSB covered 2007-2011 Altimas. Nissan's TSBs are intended to provide repair instructions for Nissan service technicians, and not to be publicized to vehicles owners.

22. NTB13-002 was issued by Nissan on January 10, 2013, to implement a voluntary service campaign to reprogram the Transmission Control Unit in an attempt to prevent a "CVT belt slip condition" from occurring on certain 2013 Nissan Pathfinders. Nissan admitted that 2013 Nissan Pathfinder vehicles experience shaking and juddering from the CVT, and attributed this to CVT belts that slipped. Nissan admitted that the CVT needed to be reprogrammed in a timely manner or it "could result in future damage to your vehicle's transmission." This TSB proved inadequate and on September 10, 2013, Nissan again issued a service bulletin (NTB13-086) to address the CVTs in 2013 Nissan Pathfinders where it conceded that reprogramming may not resolve the CVT shaking and juddering.

23. Through the issuance of two TSBs in 2012 and 2013, Nissan admitted that the Subject Vehicles contain defective CVTs leading to shaking, juddering and damage to the entire transmission. However, Nissan has failed to adequately inform consumers of the true nature of the defect, downplayed the serious, safety-related nature of the defect, and continues to offer inadequate remedies.

24. Shortly after the summer 2012 release of 2013 Subject Vehicles, on September 27, 2012, Nissan issued technical service bulletin NTB12-081, which aimed to reprogram Transmission Control Units in certain Subject Vehicles to purportedly address what Nissan admitted was shaking or juddering from the CVT when "coasting." According to Nissan, the

10

shaking and juddering occurs when the CVT belt has slipped and reprogramming the TCU would fix the defect. In its communication notifying consumers of the campaign, Nissan admitted that the CVT was defective and damaging to the overall vehicle: "continuing to drive the vehicle in this condition can lead to accelerated wear and damage to the CVT." The TSB also warns in bold "**Failure to have this reprogramming performed in a timely manner could result in future damage to your vehicles' transmission.**" The TSB also explains "if repair or replacement of the transmission becomes necessary outside of the powertrain warranty period, the resulting repair costs will be at the owner's expense." However, Nissan downplayed and covered up the seriousness of the defect, including by telling customers that "[t]his is not a safety issue."

25.     On September 10, 2013, Nissan issued a second technical service bulletin (NTB13-086) to purportedly address what Nissan admits is a "judder (shudder, single or multiple bumps or vibrations)" "during light acceleration" as a result of the defective CVTs in certain Subject Vehicles. In the service bulletin, which Nissan provided to authorized technicians, but not to customers, Nissan conceded that reprogramming the Transmission Control Unit may not resolve the defective CVT.

26.     These 2012 and 2013 technical service bulletins were not formal recalls, were not customer campaigns, were not widely publicized, and did not involve extending the warranty or otherwise reimbursing customers for repairs or replacements to the defective CVTs in the Subject Vehicles. The TSBs did not fix the defective CVT. Indeed, driver complaints about the CVTs on the Subject Vehicles continued to mount and Nissan later issued additional TSBs to purportedly address the defective CVT.

27.     In December 2013, Nissan CEO Carlos Ghosn announced that Nissan would increase oversight of Jatco, noting that expensive problems with Jatco's CVTs and customer service issues related to the transmissions were negatively impacting Nissan's bottom line.[7]

28.     Nissan settled a class action lawsuit regarding defective CVTs in the 2013–2014 Nissan Pathfinder and Infiniti QX60/JX35 vehicles, owing to a defect in the Jatco CVT which caused vibration or judder. *Batista v. Nissan North America, Inc.*, 14-cv-24728 (S.D. Fla. 2014). As part of the settlement, Nissan again provided a warranty enhancement.

29.     Between 2015 and 2018, Nissan has issued additional TSBs relating to the defective CVT in the Subject Vehicles.[8] As with the 2012 and 2013 TSBs, these were not formal recalls, did not extend the warranty on the Subject Vehicles, were not widely publicized, did not provide owners with reimbursement for out of pocket expenses to address the defective CVT, and did not provide for replacement of or an adequate repair to the defective CVTs in all Subject Vehicles.

30.     For example, on October 7, 2015, Nissan issued NTB15-083 relating to "transmission judder (shake, shudder, single or multiple bumps or vibration)" in 2013-2015 Nissan Altima and 2014-2016 Nissan Rogue vehicles. As before, through the TSB, Nissan instructed its technicians to merely reprogram the transmission control module for customers complaining of the CVT juddering and shaking. The reprogram through this TSB did not purport to fix the defective CVT. Instead, in what constitutes a further admission by Nissan of the defective CVT and Nissan's failure to fix the defect, the reprogramming was to apply a "new diagnostic logic" to

---

[7] http://www.autonews.com/article/20131202/OEM10/312029972/nissan-presses-jatco-to-end-cvt-glitches

[8] These additional TSBs and their issuance dates include: NTB15-083 (October 7, 2015); NTB15-084a (November 11, 2015); NTB15-084b (April 1, 2016); NTB16-121 (December 8, 2016); NTB16-121a (January 23, 2017); NTB15-086f (February 10, 2017); and NTB16-110i (July 6, 2018).

"enhance the diagnostic process by storing diagnostic trouble codes (DTCs) on applied vehicles" through "monitor[ing] conditions in the CVT while the customer is operating their vehicles in their usual daily drive patterns." The "new DTCs" were coded "CVT_JUDDER." Thus, the October 2015, TSB was intended to merely allow Nissan to monitor the occurrence of the defective CVTs in Subject Vehicles where the owner specifically complained of juddering – not to repair or replace the defective CVTs in all or any of the Subject Vehicles.

31.    On April 1, 2016, Nissan issued NTB15-084b. This TSB provided that if a 2013-2016 Nissan Altima owner reported a transmission judder and one of the CVT_JUDDER diagnostic codes appeared on the vehicle, the CVT assembly or control valve body might be replaced. If the CVT_JUDDER diagnostic code did not appear no additional action was taken. Nissan did not take steps to inform Subject Vehicles owners of the potential opportunity for CVT replacement under NTB15-084. This TSB was again limited and inadequate, a fact which Nissan conceded when it issued a superseding TSB known as NTB16-110, which was amended in December 2017 to include technician instructions to address the defective CVTs in the Subject Vehicles (NTB16-110g).

32.    The relief provided under the TSBs was inadequate and unnecessarily limited.

33.    Nissan has not made Plaintiff and other Class members whole for the defective CVTs in the Subject Vehicles.

***Nissan's Deceptive and Unfair Conduct***

34.    Nissan's deceptive statements and omissions of material fact relating to the defective CVT that poses safety risks to occupants and others sharing the road constituted unfair and deceptive conduct.

13

35.     Nissan's failure to service the Subject Vehicles as required under warranty to correct or replace the defective CVTs constituted unfair and deceptive conduct.

36.     In addition, Nissan's refusal to repair or replace the defective CVTs under warranty, while quoting or charging repair costs in some cases as high as several thousand dollars, knowingly presented Plaintiff and the other Class members with a series of bad choices: pay the exorbitant repair costs, pay even more money for a new vehicle, drive the Subject Vehicle in an unsafe condition, or be without a car. Knowingly placing Plaintiff and the other Class members in such an untenable position amounted to conduct that is clearly immoral, unethical, oppressive, and unscrupulous.

## CLASS ALLEGATIONS

37.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23, on behalf of a Class defined as follows:

> All persons and entities that purchased or leased a 2013 or 2014 Nissan Altima for end use and not for resale.

Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

38.     Alternatively, Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23, on behalf of a Class defined as follows:

> All persons and entities that purchased or leased a 2013 or 2014 Nissan Altima for end use and not for resale in the State of California.

Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

14

39.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

40.     The members of the Class are so numerous that joinder of the Class members would be impracticable. On information and belief, Class members number in the thousands. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Defendant's records.

41.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a.     whether Nissan engaged in the conduct alleged herein;

   b.     whether Nissan omitted and misrepresented material facts to purchasers and lessees of model year 2013 and 2014 Altimas included a "smooth" CVT transmission;

   c.     whether Nissan's omissions and misrepresentations regarding the Subject Vehicles were likely to mislead a reasonable consumer;

   d.     whether Nissan breached warranties with Plaintiff and the other Class members when it produced, distributed, and sold the Subject Vehicles;

   e.     whether Nissan's refusal to perform the necessary repairs under warranty constituted unfair conduct;

   f.     whether Plaintiff's and the other Class members' Subject Vehicles were worth less than as represented as a result of the conduct alleged herein;

   g.     whether Plaintiff and the other Class members have been damaged and, if so, the extent of such damages; and

   h.     whether Plaintiff and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

42.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class members. Similar

Case 3:18-cv-00966   Document 1   Filed 09/25/18   Page 15 of 29 PageID #: 15

or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

43.     Plaintiff's claims are typical of the claims of the other Class members because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct described above. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and no defense is available to Defendant that is unique to Plaintiff.

44.     Plaintiff is an adequate Class representative because he will fairly represent the interests of the other Class members. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class they represent, and have the resources to do so.  Neither Plaintiff nor his counsel has any interest adverse or antagonistic to those of the Class.

45.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Nissan, so it would be impracticable for Class members to individually seek redress for Nissan's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the

16

benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

46.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

47.     Defendant is and was at all relevant times a merchant with respect to Subject Vehicles, and manufactured, distributed, warranted and sold Subject Vehicles.

48.     A warranty that Subject Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

49.     Plaintiff and the other Class members purchased Subject Vehicles manufactured and sold by Defendant in consumer transactions.

50.     Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and the CVTs were not in merchantable condition and were not fit for the ordinary purpose for which cars are used. Subject Vehicles left Defendants' possession and control with defective CVTs that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiff and the other Class members used their Subject Vehicles in the normal and ordinary manner for which Subject Vehicles were designed and advertised.

51.     Defendant knew before the time of sale to Plaintiff and the other Class members, or earlier, that Subject Vehicles were produced with defective CVTs that were unfit for ordinary use and rendered Subject Vehicles unfit for their ordinary purposes.

52. Despite Plaintiff's and the other Class members' normal, ordinary, and intended uses, maintenance, and upkeep, the CVTs of Subject Vehicles experienced and continue to experience the CVT defect and premature failure.

53. Plaintiff's and the other Class members' CVTs and Subject Vehicles are not of fair or average quality. Nor would they pass without objection.

54. All conditions precedent have occurred or been performed.

55. Defendant knew before the time of sale to Plaintiff and the other Class members, or earlier, that Subject Vehicles were produced with defective CVTs that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with Subject Vehicles. Through consumer complaints, knowledge of design and production of the CVTs, internal product testing, and past experience, Defendant learned of the defect. The existence and ubiquity of the defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide. Defendant's issuance of a series of TSBs directed to Subject Vehicles' CVTs and CVTs in prior models and related vehicles shows actual knowledge.

56. Defendant's warranty disclaimers, exclusions and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any

18

informal resolution procedures or give Defendant any more time to cure the defect or cure its breaches of warranty.

57.     Defendant provided assurances that it will repair the defective CVTs through numerous TSBs[9] directed and designed to lull Plaintiff and the other Class members into reasonable and detrimental reliance on their efficacy. The TSBs nominally were addressed to aspects of the CVT and the power train, but they were all designed to and did induce detrimental reliance by Plaintiff and the other Class members into thinking their CVTs were being remediated when they were not.

58.     Defendant fraudulently concealed the defect and the cause of action from the knowledge of Plaintiff through affirmative acts done with intent to deceive. Defendant issued numerous TSBs throughout Plaintiff's ownership of his Subject Vehicle intended to mislead Plaintiff and the other Class members into believing that Defendant was curing the issues and fixing the problems. The TSBs, which purported to correct or cure Subject Vehicles' CVTs or related parts, actually concealed the persistence and breadth of the uniform defect plaguing Subject Vehicles.

59.     As a direct and foreseeable result of the defect in Subject Vehicles' CVTs, Plaintiff and the other Class members suffered diminution in the value of Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

---

[9] These TSBs include but are not limited to: NTB17-039c, NTB17-039d, NTB16-85, NTB16-85a, NTB16-110a, NTB16-110b, NTB16-110c, NTB16-110D, NTB16-110e, NTB16-110f, NTB16-110g, NTB16-121, NTB16-121a, NTB15-015h, NTB15-015g, NTB15-083, NTB15-084, NTB15-84b, NTB15-084c, NTB15-085b, NTB15-085c, NTB15-086, NTB15-086b, NTB15-086c, NTB05-86D, NTB15-087a, and NTB12-103e.

19

60. Plaintiff and the other Class members have had sufficient direct dealings with Defendant or its agents (dealerships) to establish privity of contract between themselves and Defendant. Privity, nevertheless, is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Subject Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiff and the other Class members. Privity is also not required because Plaintiff's and the other Class members' Subject Vehicles are inherently dangerous due to the aforementioned defects and nonconformities.

## COUNT II
## BREACH OF EXPRESS WARRANTY

61. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

62. Plaintiff and other Class members formed a contract with Defendant at the time they purchased their Subject Vehicles. The terms of the contract include the promises and affirmations of fact and express warranties made by Defendant.

63. Plaintiff's and the other Class members' Subject Vehicles did not perform as promised and contained a defective CVT transmission. At various times before experiencing the complete stalling event, Plaintiff brought his Subject Vehicle to Central Valley Nissan for maintenance and repairs performed by Nissan technicians.

64. Defendant breached the terms of the express warranties with Plaintiff and other Class members by not providing the Subject Vehicles with properly functioning transmissions.

65. Defendant has actual knowledge that it breached express warranties with Plaintiff and the other Class members related to the Subject Vehicles.

66. As the foreseeable and actual result of Defendant's breach of express warranty, Plaintiff and the other Class members were damaged in an amount that is difference between the value of the Subject Vehicles if they had possessed the functional transmissions and performed as represented and the value of the vehicles they actually received.

<u>**COUNT III**</u>
<u>**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301,** *et seq.*</u>

67. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

68. Plaintiff is a "consumer" within the meaning of the Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(3).

69. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

70. Subject Vehicles are "consumer products" within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(1).

71. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty or implied warranty.

72. Defendant's representations as described herein that Subject Vehicles sold to Plaintiff and other Class members would feature "smooth" CVT operation are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

73. Defendant impliedly warranted that the Subject Vehicles are fit for ordinary use.

74. Defendant breached the warranties as described herein. Contrary to Defendant's representations, Plaintiff's and Class members' Subject Vehicles are subject to shuddering, jerking, hesitation, stalling, and premature failure. As such, Plaintiff's and the other Class members' Subject Vehicles do not function as promised.

21

75.     The CVT defect renders the vehicles unfit for ordinary use. The Subject Vehicles are uniformly equipped with a CVT that is prone to exhibit an unexpected shudder, jerk, hesitation, stalling, and premature failure. This makes the vehicles unfit and unreasonably dangerous for ordinary use.

76.     Defendant knew of the defects in the Jatco CVTs included in the Subject Vehicles.

77.     Defendant knew, or should have known, of its misrepresentations and omissions regarding the capabilities of the CVTs, yet proceeded with a coordinated advertising campaign through which Defendant misrepresented that the CVTs in the Subject Vehicles operated "smoothly" or "seamlessly."

78.     Defendant had actual notice of its breach of warranty. Defendant knew before the time of sale to Plaintiff and the other Class members, or earlier, that Subject Vehicles were produced with defective CVTs that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with Subject Vehicles. Through consumer complaints, knowledge of design and production of the CVTs, internal product testing, and past experience, Defendant learned of the defect. The existence and ubiquity of the defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide. Defendant's issuance of a series of TSBs directed to Subject Vehicles' CVTs and CVTs in prior models and related vehicles shows actual knowledge.

79.     Defendant's warranty disclaimers, exclusions and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary

22

actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect or cure its breaches of warranty.

80. Defendant provided assurances that it will repair the defective CVTs through numerous TSBs directed and designed to lull Plaintiff and the other Class members into reasonable and detrimental reliance on their efficacy. The TSBs nominally were addressed to aspects of the CVT and the power train, but they were all designed to and did induce detrimental reliance by Plaintiff and the other Class members into thinking their CVTs were being remediated when they were not.

81. Defendant fraudulently concealed the defect and the cause of action from the knowledge of Plaintiff through affirmative acts done with intent to deceive. Defendant issued numerous TSBs throughout Plaintiff's ownership of his Subject Vehicle intended to mislead Plaintiff and the other Class members into believing that Defendant was curing the issues and fixing the problems. The TSBs, which purported to correct or cure Subject Vehicles' CVTs or related parts, actually concealed the persistence and breadth of the uniform defect plaguing Subject Vehicles.

82. Plaintiff and Class members were damaged as a result of Defendant's violation of the MMWA, because they received a product incapable of performing as the Defendant represented such product was capable of performing, and a product unfit for its ordinary use, rendering their vehicles less valuable than as represented.

**VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT**

83.    Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

84.    Defendant is a "person," under Cal. Civ. Code § 1761(c).

85.    Plaintiff is a "consumer," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a Subject Vehicle.

86.    Defendant's conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of its CVTs in Subject Vehicles, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* Specifically, Defendant violated the CLRA by omitting material facts and failing to disclose known defects in its CVTs which cause shuddering, hesitation, stalling, unusual noises, and ultimately, premature transmission failure, and by engaging in the following practices proscribed by Civil Code § 1770(a) in transactions that were intended to result in, and did result in, the sale of the product:

   a.   representing that the Subject Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

   b.   representing that the Subject Vehicles are of a particular standard, quality, or grade if they are of another;

   c.   advertising the Subject Vehicles with intent not to sell them as advertised; and

   d.   representing that the Subject Vehicles have been supplied in accordance with previous representations when they have not.

87.    Defendant violated the Act by selling Subject Vehicles that it knew were equipped with defective CVTs incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials, which frequently exhibit shuddering, hesitation, stalling, unusual noises, and ultimately, premature

24

transmission failure, and exposed the public to an unreasonable safety risk. Defendant omitted from Plaintiff and the other Class members the material fact that Subject Vehicles were sold with defective CVTs that caused shuddering, hesitation, stalling, unusual noises, and ultimately, premature transmission failure. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

88.     Defendant's Technical Service Bulletins directed to the CVT and its components were false, deceptive and purposely dissuaded customers from bringing their Vehicles in for inspection and/or provided them with a false sense of security by representing that the Vehicles were not subject to an incurable defect that would lead to premature transmission failure for which they would most likely have to pay.

89.     Pursuant to Civil Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to extend repair and replacement remedies to all Class members who experience shuddering, hesitation, stalling, unusual noises, and ultimately, premature transmission failure.

90.     Pursuant to § 1782 of the Act, Plaintiff notified Defendant in writing by certified mail of the particular violations of § 1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached hereto as Exhibit A. If Nissan fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumer within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this complaint to add claims for damages, as appropriate.

91.     Defendant's conduct is fraudulent, wanton, and malicious.

92.     Pursuant to § 1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

<u>COUNT V</u>
<u>VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW</u>

93.     Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

94.     The Unfair Competition Law, Business & Professions Code § 17200, *et seq.* ("UCL"), and similar laws in other states, prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendant committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code §§ 17200, *et seq.*, 17500, *et seq.*, and the common law. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of the law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

95.     In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations and omissions of material facts regarding the characteristics, capabilities, and benefits of its Subject Vehicles, as alleged. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiff and the other Class members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

96.     Further, as set forth in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to

26

consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et seq.* There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

97. Business & Professions Code § 17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Subject Vehicles.

98. Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and likely to deceive the consuming public within the meaning of Business & Professions Code § 17200, *et seq*.

99. Plaintiff has in fact been deceived as a result of his reliance on Defendant's material representations and omissions, which are described above. Plaintiff has suffered injury in fact and lost money as a result of purchasing the deceptively advertised Subject Vehicle by paying more than he should have and expending time, effort, and money to attempt to repair or replace the CVT and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

100. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

101. Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other members of

the Class collected as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

B. Appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

C. Finding that Nissan engaged in the unlawful conduct as alleged herein;

D. Awarding Plaintiff and the other Class members actual, compensatory, and consequential damages;

E. Awarding Plaintiff and the other Class members actual damages and statutory damages;

F. Awarding Plaintiff and the other Class members declaratory and injunctive relief;

G. Awarding Plaintiff and the other Class members restitution and disgorgement;

H. Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

I. Awarding Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses; and

J. Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

DATED:        September 25, 2018              Respectfully submitted,

 /s/*Kevin Sharp*

28

Kevin H. Sharp
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street
Suite 3100
Nashville, TN 37203
Tel: (615) 434-7000
Fax: (615) 434-7020
ksharp@sanfordheisler.com

Ben Barnow (*pro hac vice* to be filed)
Erich P. Schork (*pro hac vice* to be filed)
Anthony L. Parkhill (*pro hac vice* to be filed)
Jeffrey D. Blake (*pro hac vice* to be filed)
**BARNOW AND ASSOCIATES, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com
e.schork@barnowlaw.com
aparkhill@barnowlaw.com
j.blake@barnowlaw.com

Timothy G. Blood (*pro hac vice* to be filed)
Thomas J. O'Reardon  (*pro hac vice* to be filed)
**BLOOD HURST & O'REARDON, LLP**
701 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 338-1100
Fax: (619) 338-1101
tblood@bholaw.com

*Attorneys for Plaintiff and the putative Class*